**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS DIVISION**

**GLENN D. WILLIAMS,**

**Plaintiff,**

**v.**                                                                 **Civil Action No. 2:11-cv-107**
                                                                       **JUDGE BAILEY**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

**Defendant.**

**REPORT AND RECOMMENDATION RECOMMENDING THAT THE DISTRICT
COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10],
GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT[14],
AND AFFIRM THE DECISION OF THE ADMINISTRATIVE LAW JUDGE**

## I.     INTRODUCTION

On December 30, 2011, Plaintiff Glenn D. Williams ("Plaintiff"), by counsel Randall W.

Galford, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of

Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner" or "Defendant"),

pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Complaint,

ECF No. 1.) On March 5, 2012, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant

United States Attorney, filed an answer and the administrative record of the proceedings.  (Answer,

ECF No. 6; Administrative Record, ECF No. 7.)  On April 3, 2012, and May 2, 2012, Plaintiff and

the Commissioner filed their respective Motions for Summary Judgment.  (Pl.'s Mot. for Summ. J.

("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14.)  Following

review of the motions by the parties and the administrative record, the undersigned Magistrate Judge

now issues this Report and Recommendation to the District Judge.

## II.     BACKGROUND

## A.    Procedural History

On December 10, 2009[1], Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability that began on July 1, 2007.[2]  (R. at 68-71, 147-57.)  Both claims were initially denied on May 20, 2010 and again upon reconsideration on November 8, 2010.  (R. at 72-77, 81-86.)  On November 12, 2010, Plaintiff filed a request for a hearing (R. at 87), which was held before United States Administrative Law Judge ("ALJ") Steven A. De Monbreum on August 2, 2011.  (R. at 106-10.) Plaintiff appeared and testified by videoconference in Beckley, West Virginia, while the ALJ sat in Roanoke, Virginia.  (R. at 11, 29-30.)  Michael Gore, an impartial vocational expert, also appeared and testified in Roanoke, Virginia.  (R. at 29, 130.)  On August 25, 2011, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act ("Act").  (R. at 11-22.)  On November 15, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1.) Plaintiff now requests judicial review of the ALJ's decision finding him not disabled.

## B.    Personal History

---

[1] The undersigned notes that the Administrative Record contains as Exhibits 1D and 2D Plaintiff's prior applications for DIB and SSI.  (R. at 137-46.)  These applications are dated March 26, 2009 and were completed when Plaintiff was a resident of Dayton, Ohio.  (R. at 137, 144.)  However, it appears that these applications were not pursued by Plaintiff.

[2] The ALJ's decision lists a date of December 10, 2009 for when Plaintiff filed his applications for DIB and SSI. (R. at 11.)  His applications, contained as Exhibits 3D and 4D in the Administrative Record, both refer to a date of December 14, 2009.  (R. at 127, 134.) However, the Disability Determination and Transmittal sheets included in the Administrative Record as Exhibits 1A-4A list a filing date of December 10, 2009.  (R. at 68-71.)

Plaintiff was born on November 23, 1962 and was 47 years old when he filed his DIB and SSI applications. (R. at 147, 151.) He completed the eleventh grade and has prior work experience as a construction laborer, factory worker, forklift operator, and lawn care laborer. (R. at 169-70.) Plaintiff has never been married (R. at 147, 151), but has three adult children (R. at 676.)

*C.*     ***Relevant Medical History***

**1.**     **Relevant Medical History Pre-Dating Alleged Onset Date of August 1, 2007**

The administrative record indicates that Plaintiff received treatment at the Miami Valley Hospital in Dayton, Ohio beginning on November 15, 2006. (R. at 244.) At this initial treatment, Plaintiff denied experiencing any pain. (*Id.*) Plaintiff again denied any pain on December 14, 2006, and also stated that he had no new complaints and was "feeling well in general." (R. at 242.) On January 25, 2007, Plaintiff complained of experiencing sharp, intermittent back pain. (R. at 241.) However, on April 8, 2007, Plaintiff denied having any pain at a follow-up appointment. (R. at 238.) He also noted that he "feels good" and was compliant with all his medications. (*Id.*)

On January 25, 2007, Plaintiff had an X-ray of his lumbar spine taken at the Miami Valley Hospital. (R. at 255.) This X-ray revealed that Plaintiff had moderate degenerative disk disease changes in his lower thoracic and upper lumbar spine. (*Id.*) The X-ray also revealed that Plaintiff had "kyphosis of the thracolumbar junction with wedging in the lower thoracic spine as well as L1 which is likely chronic." (*Id.*)

Plaintiff was admitted to the Miami Valley Hospital on June 17, 2007. (R. at 444.) At the time of his admission, Plaintiff complained of atypical chest pain and episodes of lightheadedness and dizziness. (R. at 427.) An examination of his chest did not reveal any evidence of acute cardiopulmonary disease, but it did show "wedging in the lower thoracic spine and at the

thoracolumbar junction with some associated degenerative changes." (R. at 456-57.) Plaintiff underwent a CT scan of his head that same day. (*Id.*) This scan revealed an "unusual fat density mass with possible rupture" and a "suspect colloid cyst in the foramen of monro." (*Id.*) Two days later, Plaintiff had a cardiac stress test at Miami Valley Hospital. (R. at 454.) Dr. James Hackett determined that there were "small areas of reversible ischemia involving the apex as well as the inferoseptal portion of the left ventricle." (R. at 455.) He also noted "a left ventricular ejection fraction of 52% with good wall motion." (*Id.*) That same day, an electrocardiogram performed on Plaintiff revealed no chest pain and no ischemic ECG changes. (R. at 442-43.)

On June 20, 2007, while still at Miami Valley Hospital, Plaintiff underwent a physical examination. (R. at 434-37.) Plaintiff complained of left-sided chest pain, but also noted that his pain had been at a "fairly tolerable level" over the past six months. (R. at 434.) He also complained of some muscle aches, joint aches, and some loss of sensation in his lower extremities. (R. at 436.) Dr. Steven Burdette assessed atypical chest pain; ruptured dermoid cyst in frontal area of the brain; alcohol abuse; hypertension; and diabetes mellitus type 2. (R. at 437.) Plaintiff had a cardiac consultation with Dr. Stephen Wenzke that same day. (R. at 438.) Dr. Wenzke recommended that Plaintiff undergo a cardiac catheterization for diagnostic purposes, and Plaintiff agreed to this procedure. (R. at 439.)

Dr. Thomas Thornton performed a coronary arteriogram and left heart catheterization on July 21, 2007. (R. at 440.) Dr. Thornton assessed atherosclerotic heart disease; insulin-dependent diabetes mellitus; and hypertension. (R. at 440-41.) He also noted that Plaintiff would have a stenting of his right coronary artery the following morning. (R. at 441.) However, Plaintiff left the hospital against medical advice on June 22, 2007 because he became extremely frustrated over a

discussion regarding further methods of evaluating Plaintiff. (R. at 428.) Plaintiff advised that he "would continue further workup as an outpatient." (*Id.*)

Plaintiff was again admitted to Miami Valley Hospital on July 12, 2007. (R. at 410.) This time, Plaintiff presented to the emergency room with continuous, dull, aching chest pain. (R. at 401.) He reported that his pain increased with coughing and breathing but did not radiate to his back. (*Id.*) Plaintiff had a consultation with Dr. Joseph Malone that same day. (R. at 407.) Dr. Malone noted that at that time, Plaintiff was "chest pain free." (R. at 408.) The next day, Plaintiff had another consultation with Dr. Donald Wamsley. (R. at 404.) Dr. Wamsley noted that the cardiologist did not want to perform a procedure because of concern over Plaintiff's colloid cyst. (*Id.*) However, Dr. Wamsley believed that it was safe to perform stent placement on Plaintiff because he did not believe the cyst was in any danger of bleeding or blocking off outflow. (R. at 405.) Plaintiff also underwent a CT scan of his head on July 13, 2007. (R. at 425.) This CT scan revealed a suspected ruptured dermoid cyst "with globules of fat in interhemispheric fissure and sylvian fissure." (R. at 426.) Plaintiff's colloid cyst was noted to measure five millimeters; however, it was "without evidence of obstructive hydrocephalus." (*Id.*)

On July 19, 2007, while still at Miami Valley Hospital, Plaintiff underwent angioplasty on his right coronary artery. (R. at 410.) A bare metal stent was placed in Plaintiff's mid distal right coronary artery. (*Id.*) Dr. Stephen Schreck noted that Plaintiff "experienced some chest discomfort" but that he had "successful perclose of his right femoral artery with good hemostatus obtained." (*Id.*) During his stay, Plaintiff had a total of three stents placed. (R. at 397.) Plaintiff was discharged from Miami Valley on July 21, 2007. (R. at 410.) His discharge diagnosis was unstable angina, with secondary diagnoses of diabetes mellitus type 2; hypertension; and alcohol abuse. (R.

## 2. Relevant Medical History Post-Dating Alleged Onset Date of August 1, 2007

Plaintiff was admitted to the Miami Valley Hospital on December 9, 2007 for chest pain that had been occurring for four weeks. (R. at 336-37.) He stated that he had not taken his medications "'in a long time'" and that his pain was pressing and felt like "'a brick trying to break out.'" (R. at 335.) A physical exam revealed a normal heart rate but "[s]ignificant tenderness to palpation over left anterior ribs 10-12 and just distal to that." (R. at 341.) An X-ray of Plaintiff's chest revealed "no acute disease, no infiltrate, borderline cardiomegaly, no pneumothorax." (R. at 339.) The hospital assessed pleuritic chest pain; hypertension; diabetes; gastroesophageal reflux disease; hyperlipidemia; peripheral neuropathy; alcohol dependence; and tobacco dependence. (R. at 345.) At his discharge on December 10, 2007, Plaintiff "stated that he was feeling better and that he is able to take deep breath again without too much pain." (R. at 335.) He was instructed to take his medications as prescribed, to avoid alcohol, and to abstain from tobacco use. (*Id.*)

Plaintiff visited Miami Valley Hospital again on December 6, 2008 with complaints that his blood sugar was reading high. (R. at 372-73.) He admitted that he had been without insulin for the past three days after being discharged from jail. (R. at 377.) The hospital assessed hyperglycemia, gave Plaintiff some insulin, and prescribed Lantus and insulin. (R. at 379.) The hospital also noted that Plaintiff's sugar and pulse rate improved after being administered insulin. (*Id.*)

On May 15, 2009, Dr. Damian Danopulos completed a consultative examination report of Plaintiff. (R. at 269-78.) At this examination, Plaintiff complained of high blood pressure with headaches, diabetes, GERD, and chest pain. (R. at 272.) Dr. Danopulos assessed him with poorly controlled hypertension, nonspecific headaches, mature-onset insulin-dependent well controlled

diabetes, a history of GERD, and nonspecific chest pain.  (R. at 273.)  He also noted that Plaintiff's "ability to do any work related activity is affected and restricted from his mature-onset insulin-dependent, well-controlled diabetes with poorly controlled hypertension."  (*Id.*)

On May 19, 2009, Dr. Jerry Flexman completed a consultative evaluation of Plaintiff.  (R. at 279-83.)  Plaintiff told Dr. Flexman that he got along with others and socialized with his family and one or two friends.  (R. at 279.)  He reported that he was able to prepare food, do the dishes, do laundry, and clean.  (R. at 280.)  At the time, Plaintiff's hobbies included games, pool, going to parks, and going to thrift stores.  (*Id.*)  Dr. Flexman noted that Plaintiff enjoyed going to the library, eating out, and visiting with his siblings, children, and grandchildren.  (*Id.*)  Plaintiff did not show any signs of anxiety and had an appropriate affect with no lability.  (R. at 281.)  He also "denied multiple physical complaints."  (*Id.*)  Dr. Flexman diagnosed him with a somatoform disorder and alcohol abuse, current remission.  (R. at 282.)  He also noted that Plaintiff was mildly impaired in his ability to make judgments for simple work-related decisions, his ability to concentrate, his ability to interact with the public, supervisors, and coworkers, and his ability to respond to work pressures and changes in the work environment.  (*Id.*)

On June 9, 2009, Dr. Irma Johnston completed a Psychiatric Review Technique of Plaintiff. (R. at 285-98.)  Dr. Johnston determined that Plaintiff did not suffer from a severe mental impairment.  (R. at 285.)  Specifically, she noted that he suffered from a somatoform disorder and alcohol abuse that was in remission at the time.  (R. at 291, 293.)  Overall, Dr. Johnston determined that Plaintiff was mildly limited in his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence, and pace.  (R. at 295.)  During this consultative appointment, Plaintiff told Dr. Johnston that he was able to cook, do dishes, do

laundry, and do other chores around the house. (R. at 297.) He also reported that he enjoyed eating out, going to the library, and visiting with his siblings, children, and grandchildren. (*Id.*)

On June 16, 2009, Dr. Jon Starr completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 299-306.) Dr. Starr found that Plaintiff could occasionally lift and carry 50 pounds; could frequently lift and carry 25 pounds; could stand, walk, and sit for a total of 6 hours in an 8-hour workday; and had no limitations in pushing or pulling. (R. at 300.) He also determined that Plaintiff had no postural, manipulative, visual, communicative, and environmental limitations. (R. at 301-03.) Dr. Starr noted that Plaintiff's statements concerning the intensity, duration, and limiting effects of his symptoms were not entirely credible. (R. at 304.)

Plaintiff was admitted to Miami Valley Hospital on August 3, 2009 with complaints of worsening chest pain, nausea, and vomiting. (R. at 307.) He admitted that he had stopped taking his medications five days prior to his admission because he ran out of them. (*Id.*) Plaintiff described this pain as "sharp and constant." (R. at 309.) Dr. Scheniderman performed an X-ray of Plaintiff's chest, which revealed "no infiltrate, no pneumothorax, no pleural effusion, no congestive heart failure pattern." (R. at 313.) Plaintiff's physical was positive for chest pain and hypertension. (R. at 317.) Plaintiff began to feel some relief after being given nitroglycerine and morphine for his chest pain. (*Id.*) He was discharged on August 5, 2009 with a principle discharge diagnosis of diabetic ketoacidosis and secondary discharge diagnoses of chest pain, GERD, hyperlipidemia, hypertension, coronary artery disease, ischemic heart disease, and uncontrolled diabetes mellitus. (R. at 307.) Plaintiff had a follow-up appointment for his chest pain and diabetes mellitus on August 7, 2009. (R. at 247.) At this appointment, Plaintiff denied any chest pain or abdominal pain. (R. at 248.) A physical examination of Plaintiff revealed no abnormalities. (R. at 249-50.) It was noted

that Plaintiff was non-compliant with diabetes treatment "mainly secondary to financial reasons." (R. at 250.)

On December 14, 2009, Plaintiff had a general physical at Pocahontas Medical Practice. (R. at 589.) The doctor performing this physical noted that Plaintiff was unable to work full-time at his customary occupation or similar work because of his diabetes, cardiac limitations, and lifting restrictions. (R. at 590.) The doctor also noted that Plaintiff was unable to perform other full-time work because of his possible concussion syndrome, and that his inability to work full-time would probably last for his entire life. (*Id.*)

The record indicates that Plaintiff received treatment at the Good Samaritan Hospital in Dayton, Ohio throughout 2009. (R. at 470-73.) On February 26, 2009, Plaintiff complained of frequent headaches that occurred several times throughout the week. (R. at 473.) He reported that he felt the pain in the base of his skull and his shoulders and that he was also experiencing more pain in his shoulders. (*Id.*) A month later, Plaintiff reported that Naprosyn was helping his headaches, but that he was experiencing some pain and numbness in his feet. (*Id.*) The hospital assessed neuropathy and started Plaintiff on a Neurontin prescription; they also instructed him to continue with Naprosyn for his headaches. (*Id.*) On August 6, 2009, Plaintiff reported feeling much better. (R. at 472.) Twenty-one days later, Plaintiff stated that he felt "terrific" and had no new complaints. (R. at 471.) Finally, on September 22, 2009, Plaintiff had no new complaints, even though his back bothered him "a bit" at times from carrying a backpack. (R. at 470.)

On January 26, 2010, Plaintiff first visited Pocahontas Memorial Hospital with complaints of being sick to his stomach and short of breath. (R. at 517-19.) A view of his chest revealed "[n]o acute abnormality." (R. at 530.) He was transferred to Davis Memorial Hospital in Elkins, West

Virginia with complaints of chest pain, back pain, abdominal pain, being sick to his stomach, and being short of breath. (R. at 518, 489.) His admitting impression was of diabetic ketoacidosis versus nonketonic hypersmolar coma; possible acute coronary syndrome; acute pancreatitis; and possible non-q-wave myocardial infarction. (R. at 490.) A CT scan of his abdomen revealed a normal pancreas but "inflammatory changes in the terminal ileum and right colon area." (R. at 493.) During his hospital stay, Plaintiff underwent an echocardiogram with revealed "no focal wall motion abnormalities." (R. at 510.) Upon discharge, Plaintiff was diagnosed with diabetic ketoacidosis and uncontrolled type II diabetes secondary to compliance with medications; acute pancreatitis, likely secondary to alcohol abuse, clinically resolved; questionable small non-Q-wave myocardial infarction, clinically stable; acute blood loss anemia due to GI bleeding secondary to colon ulcer, secondary to NSAIDS and possibly alcohol; hypertension, essential, controlled; hyperlipidemia; history of coronary artery disease with multiple stent placement; history of alcohol abuse; and chronic smoker. (R. at 487-88.) Plaintiff was discharged on February 2, 2010. (R. at 487.)

Dr. Kip Beard completed an internal medicine examination of Plaintiff on April 22, 2010. (R. at 534-41.) At this consultation, Plaintiff's chief complaints were diabetes, heart disease, back and joint pain, blackouts, and dizziness. (R. at 534.) He complained of constant back and joint pain and ongoing chest discomfort. (R. at 535.) Dr. Beard noted that Plaintiff's gait was normal and that Plaintiff could step up and down from the examination table and arise from a seat without difficulty. (R. at 536.) His impression was of syncope, according to history; dizziness, described as imbalance; reported history of closed head injury with traumatic brain injury and subdural hematoma in 1996; diabetes mellitus type 2 with possible diabetic neuropathy; coronary artery disease; chest pain, history includes exertional component, cannot necessarily rule out angina, history suggests stable

chest pain history; and hypertension.  (R. at 538.)  Dr. Beard's examination of his neck, back, and joints revealed some motion abnormalities, and he noted that Plaintiff's gait was not neuropathic. (R. at 539.)  His neurological examination of Plaintiff did not reveal anything regarding his blackouts and dizziness.  (R. at 539.)

On April 29, 2010, Dr. James Egnor completed a Physical Residual Functional Capacity Assessment of Plaintiff.  (R. at 542-49.)  Dr. Egnor found that Plaintiff could occasionally lift and carry 20 pounds; could frequently lift and carry 10 pounds; could stand, walk, and sit for 6 hours in an 8-hour workday; and had no limitations in pushing or pulling.  (R. at 543.)  He determined that Plaintiff could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, and scaffolds.  (R. at 544.)  Plaintiff was found to be limited in his ability to reach in all directions.  (R. at 545.)  Dr. Egnor noted that Plaintiff should avoid concentrated exposure to extreme cold and vibration and moderate exposure to hazards.  (R. at 546.) Overall, Dr. Egnor determined that Plaintiff was not fully credible and that his residual functional capacity should be reduced to light work with some postural and environmental limitations.  (R. at 547.)

That same day, Dr. Misti Jones-Wheeler completed a consultative examination of Plaintiff. (R. at 550-57.)  Plaintiff presented to this appointment with some anxiety, poor sleep, low energy, a suicidal ideation, and a history of anger problems.  (R. at 551.)  Dr. Jones-Wheeler noted that Plaintiff was cooperative, oriented, and had a euthymic mood with a broad affect.  (R. at 553.)  She diagnosed him with alcohol dependance, early full remission; adjustment disorder with anxiety; and multiple physical health problems.  (R. at 555.)  Overall, she noted a "psychologically good" prognosis.  (*Id.*)

On May 19, 2010, Dr. Jeff Boggess completed a Psychiatric Review Technique of Plaintiff. (R. at 558-71.) He noted that Plaintiff did not have a severe mental impairment. (R. at 558.) He noted that Plaintiff had an adjustment disorder with anxiety and a substance addiction disorder. (R. at 563, 566.) Dr. Boggess determined that Plaintiff was mildly limited in his ability to maintain social functioning, but did not suffer from any other functional limitations. (R. at 568.) He also noted that Plaintiff only appeared partially credible regarding his allegations. (R. at 570.)

On July 12, 2010, Plaintiff had another general physical for a determination of disability with Dr. Leveaux at Pocahontas Medical Practice. (R. at 572-76.) Dr. Leveaux noted that Plaintiff suffers from blackouts. (R. at 574.) He also reported that Plaintiff's physical limitations mainly came from his Type 1 diabetes and consequent coronary artery disease. (R. at 576.) Overall, Dr. Leveaux noted that because of Plaintiff's multiple medical conditions, he believed that Plaintiff was disabled. (R. at 575.)

On August 30, 2010, Dr. Sharon Joseph conducted a neuropsychological screening evaluation of Plaintiff. (R. at 597-603.) Dr. Joseph noted that Plaintiff was cooperative and oriented, but that he had a depressed mood. (R. at 600.) She also reported that he seemed anxious during the evaluation. (*Id.*) During the evaluation, Plaintiff told Dr. Joseph that he was able to make the bed and put groceries away. (R. at 601.) He was also able to walk to the mailbox, go grocery shopping, and take out the garbage if it was light. (*Id.*) Plaintiff also reported that he has friends and that he likes to sit on the river bank to fish. (*Id.*) Dr. Joseph diagnosed Plaintiff with alcohol dependence in early remission and depressive disorder, not otherwise specified. (*Id.*) She also noted that his psychological prognosis was "fair." (R. at 602.)

A day later, Plaintiff underwent a CT scan of his brain at the Pocahontas Memorial Hospital.

(R. at 643.)  Dr. James Ross suspected a frontal lipoma "possibly along the interhemispheric falx although cannot exclude that this is coming from the anterior corpus callosum."  (*Id.*)  He noted that the lesion appeared benign and that Plaintiff had left frontal sinus disease but no additional abnormalities.  (*Id.*)

On September 30, 2010, Dr. Kathleen Monderewicz completed an internal medicine examination of Plaintiff.  (R. at 604-13.)  Plaintiff complained of diabetes with neuropathy, high blood pressure, heart disease, lower back pain, dizziness, blackouts, and a history of a cyst on the brain and head injuries.  (R. at 604.)  Dr. Monderewicz noted that Plaintiff had a normal gait, but that he appeared uncomfortable in the supine and sitting positions.  (R. at 607.)  She also noted that both of his shoulders had a decreased range of motion, with the right worse than the left.  (R. at 608.)  Dr. Monderewicz's impression was of type 2 diabetes mellitus, insulin requiring, with diabetic neuropathy of the forefeet; hypertension controlled on current medication; coronary artery disease, status post three stents placed; history of brain cyst on prior CT scan; history of recurrent syncope of unknown etiology; chronic low back pain with tenderness and soft tissue mass palpated over the L3-L4 area; knee pain with squatting and hip range of motion, etiology unclear; mild decreased range of motion of the shoulders, right worse than left; osteoarthritis of the hands; history of left index finger fracture, status post surgical pinning with decreased flexion of the finger; and nontender decreased range of motion of the cervical spine with no evidence of cervical radiculopathy.  (R. at 610.)  She suggested that Plaintiff should not climb or attempt heights because of his decreased balance, and that bending, stooping, squatting, lifting, carrying, and prolonged sitting and standing were limited by his lower back pain and knee pain.  (*Id.*)  Dr. Monderewicz also noted that Plaintiff's use of his upper extremities for reach appeared limited by her findings on the shoulder

exam and that he had difficulty with using his left hand for fine manipulation because of his decreased range of motion with his left index finder. (R. at 611.)

On October 18, 2010, Dr. Bob Marinelli completed a Psychiatric Review Technique of Plaintiff. (R. at 616-29.) He determined that Plaintiff suffered from an affective disorder, specifically depression, but that this was not a severe mental impairment. (R. at 616, 619.) He also noted that Plaintiff suffered from alcohol dependence, but that it was in early full remission. (R. at 624.) Dr. Marinelli determined that Plaintiff had mild limitations in his activities of daily living, his ability to maintain social functioning, and his ability to maintain concentration, persistence, and pace. (R. at 626.) He also noted that Plaintiff appeared partially credible. (R. at 628.)

That same day, Dr. Rogelio Lim completed a Physical Residual Functional Capacity Assessment of Plaintiff. (R. at 630-38.) Dr. Lim found the same exertional and postural limitations as those found by Dr. Egnor. (R. at 631-32.) He also determined that Plaintiff had no manipulative limitations. (R. at 633.) Dr. Lim noted that Plaintiff should avoid concentrated exposure to extreme cold, extreme heat, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards. (R. at 634.) Overall, Dr. Lim found that Plaintiff was not fully credible and that his residual functional capacity should be reduced to light work with postural limitations. (R. at 636.)

Plaintiff had a physical done at Pocahontas Medical Clinic on January 12, 2011. (R. at 647-53.) Dr. McCray determined that Plaintiff was unable to work full-time in his past position as a furniture mover and that he was not able to perform other full-time work because of his short-term memory loss, balance problems, and inability to sit or stand for long periods. (R. at 652.) Dr. McCray noted that Plaintiff had a "probable poor prognosis." (*Id.*)

On June 9, 2011, Dr. April Clendenin completed a psychological evaluation of Plaintiff after

Plaintiff was referred there by his attorney. (R. at 656-68.) Plaintiff told Dr. Clendenin that he felt "that if he were to return to work, he would be unable to perform adequate [sic] due to his increased physical pain and decreased psychological health." (R. at 656.) He attributed most of his emotional difficulties to depression, and most of his depression to his living arrangements. (R. at 657.) He told Dr. Clendenin that he experiences pain every day. (*Id.*) Plaintiff reported that he does not have any close friends, that he does not like large crowds, and that he has difficulty obtaining and maintaining friendships. (R. at 658.) Dr. Clendenin noted that Plaintiff had to get up and move several times during the evaluation because of numbness. (R. at 659.) She also noted that he was friendly, cooperative, and had an appropriate and reactive affect. (*Id.*) Dr. Clendenin diagnosed Plaintiff with depressive disorder; anxiety disorder; alcohol dependence, early full remission; cocaine dependence, sustained full remission; borderline intellectual functioning; diabetes, arthritis, cyst on brain, and frequent headaches; and vocational problem: unemployed. (R. at 662-63.) She recommended that Plaintiff be referred to a prescribing physician regarding psychotropic medications, that he receive a neuropsychological evaluation to rule out brain damage, that he obtain counseling, and that he be referred to a pain treatment clinic. (R. at 663.)

Dr. Clendenin also completed a mental assessment of Plaintiff's ability to do work-related activities. (R. at 665-68.) She noted that due to her findings, Plaintiff might have difficulties in dealing with the public, using judgment, dealing with work stresses, and maintaining attention and concentration. (R. at 666.) Dr. Clendenin also reported that Plaintiff may have difficulties in following and understanding instructions, behaving in an emotionally stable way, and demonstrating stability. (R. at 667.) Overall, she noted that Plaintiff's condition was likely to deteriorate if placed under the stress of a job because stress could increase his depressive and anxious symptoms. (R.

at 668.)

Plaintiff began treatment at Seneca Mental Health on June 29, 2011. (R. at 673.) At the initial appointment, he presented with anxiety, depression, delusions, impulsivity, suicidal ideations, homicidal ideations, and a history of substance abuse. (R. at 673-74.) Plaintiff reported that he had trouble falling and staying asleep and that he experienced periodic crying spells. (R. at 673.) He also noted that his depression had become worse since moving in with his sister. (*Id*.) At Plaintiff's individual therapy appointment on July 11, 2011, Dr. Weatherholt noted that Plaintiff was cooperative with a fair mood and stable affect. (R. at 672.) Dr. Weatherholt also noted that Plaintiff was oriented and had no indication of psychosis or thought disorder. (*Id.*) He determined that Plaintiff would continue with therapy once every two weeks. (*Id.*)

## D    *Testimonial Evidence*

At the hearing before the ALJ, Plaintiff testified that he lives with his sister. (R. at 33.) He also testified that he suffers from heart problems and had three stents placed in 2007. (*Id.*) Plaintiff stated that he experiences a lot of palpitations and has chest pain that lasts from a couple of minutes to 10 or 15 minutes on a daily basis. (R. at 33-34.) He noted that his chest pain occurs four to five times per day, and that he lays down or takes Nitro pills to try to relieve it. (R. at 34.)

Plaintiff also testified that he suffers from lower back pain. (R. at 34.) He reported that the pain occurs more than 90% of the day and that he has problems with bending and stooping because of his pain. (*Id.*) Plaintiff also testified that he suffers from diabetes. (*Id.*) He noted that his diabetes is poorly controlled and that he has been in the hospital with ketoacidosis approximately four times. (R. at 35.) Plaintiff takes his own blood sugar lab, and his blood sugar averages around 250 or 300. (*Id.*) He also takes two different types of insulin and various types of pills. (*Id.*)

At the hearing, Plaintiff testified that he broke his left index finger approximately 20 years ago with a bumper jack, but that he still worked "a number of years" with the broken finger. (R. at 35.) He noted that he has problems handling smaller items and cannot count change with his left hand. (R. at 36.) Plaintiff also testified that he has balance problems and often has to grab a wall or put his elbow against a wall to steady himself. (*Id.*) Plaintiff noted that he also experiences swelling in his ankles and knees. (R. at 36-37.) The swelling occurs at least monthly, and Plaintiff noted that he often has to lay down because it is so bad. (R. at 37.) However, he does nothing on a daily basis to prevent the swelling. (*Id.*)

Plaintiff testified that he suffers from headaches, and he rated the pain from these headaches as a nine on a ten-point scale. (R. at 37.) He stated that he gets these headaches about once a week, but does not go to the emergency room for relief. (R. at 37-38.) Instead, he takes prescription ibuprofen, and he testified that this "knocks [the pain] down some." (R. at 38 (alteration in original).) Plaintiff suffers from depression, and he takes Cymbalta and goes to a local mental health agency for this. (R. at 39-40.) He also suffers from GERD and experiences painful flare-ups several times per week. (R. at 42.)

Plaintiff testified that he can only stand for about 15 minute at a time, and that he can only lift a few pounds because it hurts to try to lift a gallon of water. (R. at 38-39.) He noted that he can only sit for 15 to 20 minutes at a time before experiencing discomfort, and that he can only walk about 50 yards before having to stop. (R. at 39.) Plaintiff is not a member of any groups, and he does not spend time with friends or spend much time talking on the phone. (R. at 40.) At the hearing, Plaintiff testified that he has problems with concentration because he cannot remember things, he cannot stay focused, and he has to read something two or three times to absorb it. (R. at

41.)  Plaintiff sleeps for a couple of hours "here and there" when he is able to sleep.  (*Id.*)  On an

average day, Plaintiff watches television, sits on the porch for a bit, and tries to read.  (R. at 41-42.)

**E.    *Vocational Evidence***

Also testifying at the hearing before the ALJ was Dr. Michael Gore, an impartial vocational

expert.  Dr. Gore classified Plaintiff's past work as a laborer as medium, semiskilled work with

transferable skills; his work as a forklift operator as medium, semiskilled work; and his work as a

wood furniture repairer as medium, lower skilled work.  (R. at 44-45.)  He noted that Plaintiff's

work as a forklift operator and furniture repairer involved no transferable skills.  (R. at 45.)

The ALJ then posed the following hypotheticals to Dr. Gore:

Q:    I want you to assume a hypothetical individual with age, education and past
       work experience as claimant who has the following residual functional
       capacity.  This individual can occasionally lift and/or carry, putting up or
       pulling eight pounds, frequently lift and/or carry, putting up or pulling 10
       pounds.  This individual can stand and/or walk at normal break for a total of
       about six hours in an eight hour day, sit with normal breaks for a total of
       about six hours in an eight hour day.  This individual can occasionally climb
       ramps, stairs to never climb ladders, ropes or scaffolds, can occasionally
       balance, stoop, kneel, crouch, crawl.  This individual should avoid
       concentrated exposure to extreme heat, cold, vibrations, fumes, dust, odors,
       gases, poor ventilation, and also hazards such as dangerous moving
       machinery and unprotected heights.  I take it I've described a range of light
       exertional work activity?

A:    Yes, Your Honor, you have.

Q:    And, since all of his past relevant work was at medium I take it he cannot
       return to that work.  Is that correct?

A:    That is correct, sir.

Q:    And with no transferable skills for light are there light unskilled jobs that my
       hypothetical individual could perform?

A:    Yes, Your Honor, the person you're describing at the present time could
       perform a number of jobs at the light exertional, unskilled jobs at the light

exertional level. For example there is even clerical work that involves working in warehouses and the position I would point toward would be order caller. That work is performed at the light exertional level and is unskilled work and the DOT code for order caller is 209.667-014. I would estimate nationally for this position, approximately 278,715 and in the states of Virginia and West Virginia combined I would estimate 14,506 workers. The person you're describing at the present time can also perform work in the laundry industry as a folder. This work is performed at the light exertional level and is unskilled work. The DOT code is 369.687-018. I would estimate nationally for this position 141,916 and for Virginia and West Virginia combined, 3,242 such workers. I believe the, yes, the person you're describing at the present time could also work in the garment manufacturing industry. This also applies to laundry industry as an unskilled bagger at the light exertional level. This position is light and, of course, unskilled, and the DOT code would be 920.687-018. I want to check one thing about the bagger position.

Q:      Sure.

A:      I'm sorry. Nationally, the estimate would be 382,325 and West Virginia and Virginia combined I would estimate 9,506 such positions.

. . .

Q:      Do any of these jobs require the person to deal with the public? Because you indicated the order caller was in a warehouse. The laundry folder I take it is in a laundry factory type situation and garment laundry bagger is also in a factory setting, correct?

A:      That is correct. The order caller position does not require dealing with the public. It does require capability to read items listed on an order sheet to laborers in the stores area of the warehouse.

Q:      But not dealing with the public?

A:      No, sir.

Q:      And the laundry folder?

A:      The laundry folder does not involve dealing with the public either.

Q:      And the bagger?

A:      That does not involve dealing with people.

(R. at 46-48.)

Mr. Galford, Plaintiff's attorney, then posed the following questions to Dr. Gore:

Q:    If we assume the hypothetical given and added to it due to neuropathy or
      other problems the person had difficulty fingering and could not use their left
      hand for fingering and was slightly limited with the right. Would that affect
      their ability to do the jobs named and are there other jobs they could do?

A:    Yes, difficulty with fingering and this is the dominant, the –

Q:    No, the not –

A:    Non-dominant and minor difficulty of the dominant, right?

Q:    Yes.

A:    Okay, well, the order caller position requires frequent fingering. The finger
      is more fine manipulations as opposed to handling or reaching or grabbing
      product, of course –. The folder position requires occasional involved and
      of course the bagger position is frequent fingering. I would indicate the
      person you're describing at the present time could not perform these three
      positions. There are other positions that require no more than occasional
      reaching, handling and fingering and also I imagine I would you need stay
      [sic] with the gist of the hypothetical, which involves I think, not dealing
      with people now.

. . .

A:    There are production work positions at the light exertional level that are
      unskilled such as thermal surfacing machine operator, DOT code is 679.685-
      010 that don't require more than occasional reaching, handling and fingering.

. . .

A:    Thermal T-H-E-R-M-A-L, surfacing machine operator. Nationally there are,
      I would indicate 71,406 and in West Virginia and Virginia combined 2,110
      such positions. There are positions for unskilled wood working machine
      setters too that are light and unskilled and also require no more than
      occasional reach, handle and fingering. A roofer and stripper operator would
      be the position I could point toward. The DOT code for this one is 669.685-
      102 and again, of course, this is light work, unskilled work and for this one
      position, nationally there are approximately 14,392 and then in West Virginia
      and Virginia combined, 770. Then we have and there are positions for

unskilled inspectors and testers that again require only occasional reaching, handing and fingering and at the light exertional level and unskilled. I would point toward laminating machine offbearer. DOT code 569-686.046. Nationally I would estimate 74,310 and for in West Virginia and Virginia combined, 2,139 such positions.

. . .

Q: Let me ask you to assume the original hypothetical again and to add to it that the person would be off task four to five times a day for ten minutes due to heart flare ups and one hour four days a month so about once a week they'd be off task and unable to work due to a headache. Would that affect their ability to hold either the–

ALJ: I think you've got too much going on there. I can't even do the math in my head. Why don't you just say due to his medical problems he's going to miss more than two days a month. What are you going to say, Dr. Gore?

Atty: Well, I wasn't.

VE: I followed our attorney's reasoning on this also, but I will, first of all

ALJ: Let's break it down, let's go okay with the heart problems he requires breaks four times a day for 20 minutes. I think that that precludes full time competitive employment, correct?

VE: Yes, sir, that is correct.

ALJ: Okay, and the second one he has a headache one time a week where he's off task, say a couple of hours he has to miss and he has to do that four weeks a month.

VE: That describes a person that would not be able to sustain gainful work activity.

ALJ: And let's assume that he's going to be missing, due to his various medical conditions two or more days a month, does that preclude work?

VE: Yes, sir the person would simply not be reliable enough to maintain substantial gainful activity.

(R. at 48-51.)

A Report of Contact form dated May 19, 2010 noted that Plaintiff could not perform his past

work as a laborer, forklift/truck operator, or wood furniture repairer. (R. at 203.) However, Plaintiff could perform work as a counter clerk, mill stenciler, and ironer. (*Id.*) Another Report of Contact form dated November 5, 2010 determined that Plaintiff could not perform his past work, but that he was able to perform work as an overhead cleaner maintainer, billiard table assembler, and glass-lined tank repairer. (R. at 224.)

## F.    *Lifestyle Evidence*

In an Adult Function Report dated February 16, 2010, Plaintiff reported that he spends his day reading, watching television, preparing meals, and trying to walk around his house and yard as much as possible. (R. at 194.) He noted that his conditions affect his balance when he is in the shower and that he often experiences dizziness and problems with balancing and stability. (R. at 195.) Plaintiff stated that he needed reminders to take his medications. (R. at 196.)

Plaintiff reported that he is able to prepare his own meals, but only prepares simple things such as soup and sandwiches. (R. at 196.) He does a limited amount of laundry and stated that it takes him about thirty minutes to fold laundry. (*Id.*) He does not drive because of dizziness, blurred vision, and lack of driver's license. (R. at 197.) He does not do any shopping, and he is unable to pay bills or handle a savings account because of his reported lack of organization. (*Id.*)

Plaintiff's hobbies and interests include reading, watching television, building models, and learning to use a computer. (R. at 198.) However, he noted that he has difficulties comprehending the computer and what he reads. (*Id.*) He reported that he does not spend time with others and only goes to appointments. (*Id.*)

In another Adult Function report dated June 12, 2010, Plaintiff reported that his conditions limit his ability to work because they make it hard to breathe and cause him to experience pain,

dizziness, and blackouts.  (R. at 206.)  He also had joint problems, shortness of breath, chest pains, and finds it hart to stand or sit for very long or stay focused.  (*Id.*)

Plaintiff reported that he does his own laundry once a week and that it takes him about twenty to twenty-five minutes to fold it.  (R. at 208.)  He makes sandwiches and microwave meals for himself.  (*Id.*)  Plaintiff shops for food when he can get a ride to a store, and shopping takes him about thirty minutes.  (R. at 209.)  In this report, he noted that he can pay bills, count change, and use a checkbook and money orders.  (*Id.*)  Furthermore, Plaintiff reported that he was no longer able to build models.  (R. at 210.)

### III.   CONTENTIONS OF THE PARTIES

Plaintiff, in his motion for summary judgment, asserts that he is entitled to summary judgment "on the grounds that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law."  (Pl.'s Mot.)  Specifically, Plaintiff asserts that he is entitled to summary judgment because:

•      The ALJ erred by failing to properly evaluate the combined effect of all his impairments;

•      The ALJ erred by not assigning sufficient weight to the opinion of Plaintiff's treating physicians; and

•      The ALJ erred by failing to properly evaluate obesity alone or in combination with Plaintiff's other impairments.

(Br. in Supp. Mot. for Summ. J. ("Pl.'s Br."), ECF No. 11 at 7.)[3]  Plaintiff asks the Court to reverse or remand the ALJ's decision.  (*Id.* at 10.)

---

[3] Plaintiff did not number the pages of his brief supporting his Motion for Summary Judgment.  Therefore, when referring to Plaintiff's brief, the undersigned utilizes the page numbers of the document filed on CM/ECF.

Defendant, in his motion for summary judgment, asserts that the ALJ's decision "is supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot.) Specifically, Defendant alleges that:

- Substantial evidence supports the ALJ's RFC assessment; and

- The ALJ properly considered Plaintiff's impairments, including his obesity, individually and in combination.

(Def.'s Br. Supp. Mot. for Summ. J. ("Def.'s Br.") at 13-19, ECF No. 15.)

## IV.   STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.   ANALYSIS

### A.   *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. §§ 404.1520, 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920 (2011). If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. *Id.*

B.   *Discussion of the Administrative Law Judge's Decision*

Utilizing the five-step sequential evaluation process outlined above, the ALJ made the following findings:

1.   **The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.**

2.   **The claimant has not engaged in substantial gainful activity since August 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

3.   **The claimant has the following "severe" impairments: diabetes with neuropathy in the feet, history of head injury, history of brain cyst, coronary artery disease status post three stents, history of syncope, degenerative disc disease, degenerative joint disease, history of left index finger fracture 20 years ago, and obesity (20 CFR 404.1520(c) and 416.920(c)).**

4.   **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**

5.   **After careful consideration of the entire record, the undersigned finds**

that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can occasionally climb ramps and stairs, but not ladders, ropes, or scaffolds. He can occasionally balance, kneel, stoop, bend, crouch, and crawl. He should avoid concentrated exposure to extreme temperatures, dust, fumes, odors, chemicals, and gases. He should avoid concentrated exposure to hazards and vibrating surfaces.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 23, 1962 and was 44 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.4569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. at 13-21.)

## C.    *Analysis of the Administrative Law Judge's Decision*

### 1.    The ALJ Properly Evaluated the Individual and Combined Effect of Plaintiff's Impairments, Including His Obesity

As his first assignment of error, Plaintiff asserts that the ALJ failed to evaluate the combined

effect of all his impairments. (Pl.'s Br. at 8.) Specifically, Plaintiff alleges that the ALJ "failed to

consider the increased effect of the obesity on the musculoskeletal and cardiovascular impairments."
(*Id.*)  He also argues that the ALJ "failed to make findings about [his] pain affecting his ability to
perform activities."  (*Id.* (alteration in original).)  According to Plaintiff, his "pain, obesity, and
combined effect of all impairments would impose a level of non-exertional limitations which could
preclude substantially gainful employment activity."  (*Id.* at 10.)  As his third assignment of error,
Plaintiff asserts that the ALJ failed to properly evaluate his obesity alone or in combination with his
other impairments.  (*Id.* at 7.)  According to Plaintiff, the combined effects of his pain, obesity, and
physical limitations cause him to be unable to perform light work.  (*Id.* at 10.)  Because these two
assignments of error are similar, the undersigned will consider them together.  However, the
undersigned finds Plaintiff's arguments to be without merit.

Obesity, while no longer a listed impairment, is a medically determinable impairment that
can meet or equal a listing impairment when combined with an impairment of the musculoskeletal,
respiratory, or cardiovascular body system.  SSR 02-1p, 2000 WL 628049 at *1 (Sept. 12, 2002).
At Step Three of the evaluation process, the administrator may find that obesity, either by itself or
in combination with other impairments, meets a listed impairment if the obesity is equivalent in
severity: "[f]or example, if the obesity is of such a level that it results in an inability to ambulate
effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for [the
criteria of 1.02A] and we will then make a finding of medical equivalence."  *Id.* at *5.

The ALJ's failure to explicitly consider the effects of a claimant's obesity could be harmless
error.  *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006); *see also Skarbek v.
Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) ("[A]ny remand for explicit consideration of
[claimant's] obesity would not affect the outcome of this case."); *cf. Ngarurih v. Ashcroft*, 371 F.3d

182, 190 n.8 (4th Cir. 2004). Furthermore, when appealing the ALJ's decision, the claimant must specify how his obesity (1) limits his functioning and (2) exacerbates his or her impairments. *Moss v. Astrue*, No. 2:11-cv-44, 2012 WL 1435665, at \*6 (N.D. W. Va. Apr. 25, 2012) (citing *Cook v. Astrue*, 800 F. Supp. 2d 897, 907-08 (N.D. Ill. 2011)).

In Plaintiff's case, the ALJ's decision clearly shows that he discussed the effects of Plaintiff's impairments individually and in combination. *See Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1991) (holding that an ALJ has properly considered impairments in combination where the ALJ has discussed each impairment separately and then found that the claimant's "impairments," assuming that he had more than one impairment, did not prevent him from performing work activity). At Step Two of the sequential evaluation, the ALJ noted that Plaintiff's obesity was a severe impairment. (R. at 13.) Furthermore, at Step Three, the ALJ specifically stated that he had considered Plaintiff's obesity pursuant to SSR 02-1p and determined that it, in combination with his other impairments, did not meet or equal a listed impairment. (*Id.* at 14-15.) During Step Four, the assessment of Plaintiff's residual functional capacity ("RFC"), the ALJ specifically cited SSR 02-1p and its requirement that ALJs "consider obesity in determining whether a claimant has medically determinable impairments that are severe, whether those impairments meet or equal any listing, and finally in determining the residual functional capacity." (R. at 16.) In Plaintiff's case, the ALJ considered whether obesity had an effect on the cardiovascular and respiratory systems and the ability to sustain physical activity during an eight-hour workday. (*Id.*) Finally, the ALJ noted that he took these considerations into account when reaching his conclusions regarding Plaintiff's RFC. (*Id.*) Because of Plaintiff's limitations arising from his obesity, the ALJ limited him to light work involving occasional climbing of ramps and stairs, balancing, kneeling, stooping, bending,

crouching, and crawling, and no climbing of ropes, scaffolds, and ladders. (*Id.* at 15.)

The undersigned notes that none of the medical evidence upon which the ALJ relied ever mentioned Plaintiff's obesity and any effects it may have on his impairments. Furthermore, Plaintiff has not specified how his obesity limits his functioning and exacerbates his impairments. *See Moss*, 2012 WL 1435665, at *6. Instead, Plaintiff has only stated that his obesity affects his cardiovascular and musculoskeletal impairments. (Pl.'s Br. at 8.) As discussed above, the ALJ did consider Plaintiff's obesity as required by SSR 02-1p. Therefore, substantial evidence supports the ALJ's determinations regarding Plaintiff's impairments.

As part of his assignment of error, Plaintiff also alleges that the ALJ failed to make findings concerning whether an objective basis for Plaintiff's pain existed and how his pain affected his ability to perform activities. (Pl.'s Br. at 8.) The determination of whether a person is disabled by pain or other symptoms is a two-step process. *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996); *see also* 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medial evidence an impairment capable of causing the degree and type of pain alleged. *Craig*, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. *Id.* Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. *Shively v. Heckler*, 739 F.2d 987, 989-90 (4th Cir. 1984).

Neither Plaintiff nor Defendant dispute the ALJ's determination that Plaintiff has "medically determinable impairments [that] could reasonably be expected to cause the alleged symptoms." (R. at 16 (alteration in original).) Because the objective medical evidence indicates that Plaintiff does suffer from these conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms. *See Craig*, 76 F.3d at 585. In fact, the ALJ explicitly mentioned evidence pertaining to Plaintiff's daily activities:

Moreover, the claimant's hearing testimony and record reflect merely mild restrictions of daily living activities. The claimant's hearing testimony reported daily living activities of watching television, sitting on the porch and reading. He further reported walking around the house and yard, independent personal care, preparing meals, taking medications, doing laundry, grocery shopping, and attending

appointments. He reported problems getting along with family, friends, neighbors, others, and authority figures. He further reported problems with memory, completing tasks, concentration, understanding, and following instructions, but he is able to follow spoken instructions "fair," pay bills, count change, and use a checkbook/money orders.

(R. at 18-19.)

Before discussing this evidence, the ALJ then discussed medical and non-medical evidence which is inconsistent with Plaintiff's subjective complaints, including:

• On August 23, 2007, Plaintiff was discharged from the hospital in good condition after placement of a third stent for his chest pain. (R. at 16.)

• An X-ray of Plaintiff's chest on December 9, 2007 revealed a stable chest. (R. at 16.)

• In December 2007, Plaintiff was again discharged from the hospital in good condition after complaints of chest pain. (R. at 17.) Dr. Raslich advised that Plaintiff cease using alcohol and become compliant with his medication. (*Id.*)

• On August 3, 2009, Plaintiff went to the emergency room with chest pain after running out of his medications five days before. (R. at 17.) A chest X-ray revealed no acute abnormalities, and Plaintiff was discharged in good condition on August 5, 2009. (*Id.*)

• Plaintiff did not have any new complaints except for some back pain from his backpack on September 22, 2009. (R. at 17.) Dr. Thompson noted that Plaintiff's coronary artery disease, hypertension, and diabetes mellitus were in stable condition. (*Id.*)

• On January 26, 2010, an X-ray of Plaintiff's chest revealed no acute abnormalities. (R. at 17.)

• An examination of Plaintiff performed by Dr. Beard on April 27, 2010 revealed a mild cervical/lumbar spine and knee tenderness; however, Dr. Beard noted that Plaintiff had a

normal gait, negative straight leg raise, and normal range of motion in his back.  (R. at 18.)

- Dr. Monderewicz's examination of Plaintiff on September 30, 2010 revealed that Plaintiff had a decreased range of motion in his neck and shoulders; however, he had a normal gait and negative straight leg raise.  (R. at 18.)  However, Dr. Monderewicz noted that Plaintiff should not climb or attempt heights because of decreased balance and neuropathy, and that he was also limited in prolonged sitting, standing, bending, stooping, squatting, lifting, and carrying because of knee pain.  (*Id.*)

- On June 1, 2011, Dr. McCray's examination of Plaintiff revealed that he had a normal neck, lungs, heart, chest, posture, and gait.  (R. at 18.)

After considering this evidence, the ALJ determined that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity."  (R. at 16.)  Therefore, the ALJ did consider the intensity and severity of Plaintiff's pain.  *See Craig*, 76 F.3d at 594; SSR 96-7p, 1996 WL 374186, at *3.

In sum, the ALJ properly considered the effect of Plaintiff's obesity, both individually and in combination with his other impairments, on his ability to perform work.  The ALJ also properly considered the effects of Plaintiff's pain as required by *Craig* and SSR 96-7p.  Therefore, substantial evidence supports the ALJ's determination regarding the effects of Plaintiff's impairments.

## 2.    The ALJ Gave Proper Weight to the Opinion of Plaintiff's Treating Physician

As his second assignment of error, Plaintiff asserts that the ALJ should have afforded "[g]reat weight" to the opinion of his treating physicians, Dr. Leveaux, because Dr. Leveaux "treated him throughout the relevant period and found he was disabled."  (Pl.'s Br. at 10.)  He also asserts

that more weight should have been afforded to Dr. McCray's opinion.  (*Id.* at 9.)  However, the undersigned finds that Plaintiff's argument is without merit.

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996).  When an ALJ does not give a treating source opinion controlling weight and determines that the claimant is not disabled, the determination or decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).  However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance."  SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996).  For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work.  20 C.F.R. § 416.927(e)(1).  Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never ben entitled to controlling weight or given special significance."  SSR 96-5p, 1996 WL 374183, at *5.

As an initial matter, the portions of Dr. Leveaux's and Dr. McCray's opinions stating that Plaintiff is disabled and unable to work are not entitled to controlling weight.  *See* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1); *see also Morgan v. Barnhart*, 142 F. App'x, 716, 722 (4th Cir. 2005) (finding that physician's statement that claimant "can't work a total of an 8 hour day" is a legal conclusion with no evidentiary value).  Because these portions of their opinions are not medical

evidence, the ALJ properly did not assign controlling weight to Dr. Leveaux's and Dr. McCray's opinions on these issues.

Furthermore, Dr. Leveaux's and Dr. McCray's opinions are inconsistent with other substantial medical evidence in the record. In particular, Dr. McCray noted that Plaintiff was unable to work because of his balance problems, short-term memory loss, and inability to sit or stand for prolonged periods. (R. at 18; *see also* R. at 652.) Dr. Leveaux noted that Plaintiff was unable to work because of "multiple medical conditions." (R. at 575.) However, Dr. Beard, in his consultative examination report, noted that while Plaintiff does have to change position frequently because of his back pain, his pain was treated through medication and chiropractic treatment. (R. at 535.) Dr. Beard further noted that Plaintiff could stand unassisted, get up from a seat, and step up and down from the examination table without difficulty. (R. at 536.) Furthermore, Dr. Beard noted that Plaintiff had a normal gait and did not appear to require ambulatory aids or assistive devices. (*Id.*) Finally, he stated that Plaintiff "seemed comfortable while seated." (*Id.*) Also, Drs. Egnor and Lim, state agency consultants, both noted that Plaintiff could perform light work because his complaints were not fully credible. (R. at 547, 636.) State agency consultants are "highly qualified" and "experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(f)(2)(i), 416.927(f)(2)(i). Therefore, the ALJ properly relied on the opinions of Drs. Egnor and Lim in making his determination.

Dr. Leveaux's and Dr. McCray's opinions are also inconsistent with other evidence in the record, particularly evidence regarding Plaintiff's daily activities. At the hearing, Plaintiff reported that he spends his days watching television, reading, and sitting on the porch. (R. at 18.) He also walks around the house and yard, prepares meals, does laundry, completes personal care, and goes

grocery shopping. (*Id.*) Furthermore, in his Adult Function Report dated February 16, 2010, Plaintiff stated that he can walk 300-500 yards without resting. (R. at 199.) Four months later, Plaintiff conceded that he could lift up to 20 pounds. (R. at 211.) In 2009, Plaintiff reported that he cleaned, had been caring for his ill brother before his death, went to the library, enjoyed eating out, and participated in activities such as games, pool, and going to parks and thrift stores. (R. at 280.) These daily activities are inconsistent with Dr. Leveaux's opinion that Plaintiff is disabled because of multiple medical conditions and Dr. McCray's opinion that Plaintiff cannot work because of balance problems, short-term memory loss, and inability to sit or stand for prolonged periods of time.

Finally, these treating source opinions are not entitled to greater weight because they are inconsistent with their own treatment notes. After performing his physical examination of Plaintiff, Dr. Leveaux noted that Plaintiff generally had normal examination findings. (R. at 572-75, 589-90.) Although he noted that Plaintiff's physical limitations stemmed from his coronary artery disease and diabetes (R. at 576), Dr. Leveaux thought that Plaintiff was unable to work because of multiple medical conditions (R. at 575). Furthermore, while Dr. McCray opined that Plaintiff was unable to work because of balance problems and an inability to sit or stand for prolonged periods of time, his examination of Plaintiff revealed a normal posture and gait. (R. at 651.) Therefore, because Dr. Leveaux's and Dr. McCray's opinions are inconsistent with other substantial medical evidence and inconsistent with their own treatment notes, the undersigned finds that the ALJ assigned proper weight to these opinions.

In his brief, Plaintiff appears to suggest that the opinions of his treating physicians are entitled to greater weight because he has additional impairments, such as depression, that prevent

him from working.  (Pl.'s Br. at 9.)  However, this assertion is unsupported by the record.  On his disability report form, Plaintiff never identified depression or any other mental impairment as a basis for his alleged inability to work.  (R. at 168.)  The medical evidence contained in the record regarding Plaintiff's mental status shows that Plaintiff was oriented, cooperative, had a normal thought content, adequate memory, and adequate attention and concentration.  (R. at 280-81, 553-54, 600-01, 659.)  Three state agency psychologists, after reviewing the evidence contained in the record, determined that Plaintiff did not have a severe mental impairment.  (R. at 285-98, 558-71, 616-29.)

In sum, substantial evidence supports the ALJ's decision.  Not only did Dr. Leveaux's and Dr. McCray's opinions conflict with other substantial evidence in the record, but they also contradicted their own treatment notes.  Furthermore, the evidence in the record demonstrates that Plaintiff does not suffer from additional mental impairments such as depression.  Therefore, the undersigned finds that the ALJ assigned proper weight to the opinions of Plaintiff's treating physicians.

## VI.    RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's applications for disability insurance benefits and supplemental security income is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and

Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this **16th day** of **May, 2012**.


_____
DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE